**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION**

|  |  |  |
|---|---|---|
| **ANTHONY SULLIVAN,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *-vs-* | ) | **Case No. _____** |
| | ) | |
| **SYNEOS HEALTH, LLC,** | ) | **JURY DEMAND** |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT

COMES NOW THE PLAINTIFF ANTHONY SULLIVAN sues the Defendant, SYNEOS HEALTH, LLC and would state as follows:

### I. INTRODUCTION

1. The COVID-19 pandemic has impacted every aspect of American life. Governments throughout the world have grappled with how to balance protection of one's health and yet maintain a semblance of normalcy in everyday life.

2. For the first time in the history of the United States, many employers have made a condition of their employees' continued employment that they inject into their bodies multiple times a foreign, experimental drug that lacks approval by the Federal Drug Administration.

3. Anthony Sullivan is a former employees of Syneos Health, LLC. He brings this action for compensatory and statutory damages against Syneos Health, LLC under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e for constitutional violations arising out of Syneos' mandate on September 2, 2021, that all employees receive the COVID-19 vaccine. The Plaintiff

was given no options but to submit to this experimental vaccination or be terminated from his employment.

4.     This mandate inserts the employer into the Plaintiff's personal and private medical decisions, and violated their sincerely held religious beliefs.

## II. JURISDICTION AND VENUE

5.     This Court has jurisdiction over all federal claims in the Complaint arising under 28 U.S.C. § 1331.  In addition, this Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6.     Venue lies in this District pursuant to 28 U.S.C. § 1391, since this is where the Defendant Syneos Health, LLC is located, and where the discriminatory actions complained of took place.

## III. PARTIES

### *Plaintiff*

7.     Plaintiff, Anthony Sullivan is an adult citizen and resident of the State of New Jersey, and is a former employee of Syneos Health, LLC.

### *Defendant*

8.     Defendant Syneos Health, LLC ("Syneos") is a Delaware Limited Liability Company. Its principal headquarters are located at 1030 Sync Street, Morrisville, North Carolina. Process may be served on its registered agent in the State of North Carolina: United Agent Group, Inc., 15720 Brixham Hill Avenue, # 300, Charlotte, NC 28277.

## IV. STATEMENT OF FACTS

9.     Syneos is a biopharmaceutical company with employees located in various states including the State of North Carolina.

10.     Syneos' clients include: Johnson & Johnson, Abbvi/Pharmacyclics, Nevro, and LEO Pharma.

11.     On March 24, 2021, Syneos updated their Return To Field (RFT) guidance policy. The new policy explained that on April 19, 2021, employees could resume making in-person calls to clinics.  There were no restrictions stated with regard to this guidance policy.

12.     On May 11, 2021, Syneos announced that they would *not* be requiring employees to submit to COVID-19 vaccination. However, Syneos continued to "encourage [its employees] to get vaccinated if [they] have not already done so.

13.     The U.S. Food and Drug Administration ("FDA") announced on July 12, 2021, that near real-time surveillance detected four potential Adverse Events of Interest (AEI) following receipt of Pfizer's vaccine.[1] The four potential AEI were pulmonary embolism, acute myocardial infarction, immune thrombocytopenia, and disseminated intravascular coagulation, which means that the events were blood clotting in the lungs, insufficient oxygen to the heart, low blood platelet levels, and disseminated intravascular coagulation.[2]

14.     The FDA fact sheets specified, by July of 2021, that individuals set to receive the Pfizer, Moderna, Johnson & Johnson, and Novavax vaccines could experience a severe allergic reaction. Myocarditis and pericarditis, two forms of heart inflammation, are possible after receipt of the Pfizer, Moderna, and Novavax. Trials of these vaccines by July of 2021, demonstrated a causal link between heart inflammation and the Pfizer and Moderna vaccines, according to U.S.

---

[1] U.S. Food and Drug Administration, Initial Results of Near Real-Time Safety Monitoring of COVID-19 Vaccines in Persons Aged 65 Years and Older, July 12, 2021, https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/initial-results-near-real-time-safety-monitoring-covid-19-vaccines-persons-aged-65-years-and-older

[2] *The Epoch Times*, Exclusive: FDA Preparing to Publish Study on 4 Potential Adverse Events Following Pfizer Vaccination,  Zachary Stieber, October 2, 2022, https://www.theepochtimes.com/exclusive-fda-preparing-to-publish-study-on-4-potential-adverse-events-following-pfizer-vaccination_4768103.html?utm_source=ref_share&utm_campaign=mb-cc

health officials. Other side effects that had been reported after receipt of one or more of the vaccines included swollen lymph nodes, skin tingling, blood clots, and diarrhea[3].

15.     Despite the FDA admission that there could be possible severe reactions from these COVID-19 vaccines, on September 2, 2021, all Syneos U.S. – based employees were notified of a companywide vaccine mandate by email, with medical and religious exemptions indicated as offered options. The notice provided a deadline of October 22, 2021 to either receive the full vaccination protocol (either two Pfizer, or two Moderna, or one Johnson & Johnson) and upload extensive proof or file an exemption request.

16.     Several days later on September 9, 2021, President Biden announced a "new plan to require more Americans to be vaccinated" by imposing "new vaccination requirements" that would "require all employers with 100 or more employees, to ensure their workforces are fully vaccinated or show a negative test at least once a week." He also announced plans to "require vaccinations" of all "those who work in hospitals, home healthcare facilities, or other medical facilities." The so-called "Biden Mandate" further provided an executive order requiring all executive branch federal employees to be vaccinated. Another executive order required that all federal contractors to do the same.[4]

17.     Following President Biden's remarks, the Department of Labor's Occupational Safety and Health Administration (OSHA issued an Emergency Temporary Standard (ETS) to implement" the requirement that all employers with 100 or more employees to ensure their

---

[3] *The Epoch Times*, Exclusive: FDA Preparing to Publish Study on 4 Potential Adverse Events Following Pfizer Vaccination, Zachary Stieber, October 2, 2022, https://www.theepochtimes.com/exclusive-fda-preparing-to-publish-study-on-4-potential-adverse-events-following-pfizer-vaccination_4768103.html?utm_source=ref_share&utm_campaign=mb-cc
[4] Joseph Biden, Remarks at the White House (September 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (accessed September 10, 2021).

workforce is fully vaccinated or require any workers who remain unvaccinated to produce a negative test result on at least a weekly basis.

18.    On October 6, 2021, Syneos promulgated a letter which provided that a "determination within 15 business days" would be made as to whether Syneos would "provide an accommodation without creating an undue hardship on the company."  Syneos did not communicate a "determination within 15 days" that an accommodation request for an exemption would impose an "undue hardship on the Company."  Instead, the employees continued to perform all of the employment related responsibilities and engage in any in-person interactions with customers as an assigned employee of their respective clients.  It was not until some 65 days later that Syneos informed the employees by letter dated December 9, 2021 that the approved accommodations could not be granted due to "undue hardship" to Syneos because of the "extensive in-person contact" job responsibilities.  The superficial and conclusory communication provided no specificity as to how an exemption for the employees would impose an undue hardship to Syneos, nor did it explain why the employees of those clients who had the exact same "extensive in-person contact" with employees were receiving exemptions and accommodations.  Nor did the letter or any subsequent communication explain why those employees (see Plaintiff, Korri Culbertson's biographical narrative below, paragr. 179, *et. seq.*) that performed the majority of their work virtually and not "in-person" could not be granted exemption and/or accommodation.

19.    On October 20, 2021, Syneos' General Counsel and Corporate Secretary, Jonathan Olefson, sent an email to all of the company's U.S.-based corporate, commercial and clinical employees advising them of a deadline of October 22, 201, within which to upload to the company's website their personal COVID-19 vaccination information proving receipt of the experimental COVID-19 vaccine.

20.     Syneos' company-wide vaccine order made no exception for individuals who had natural immunity, which is proven 27-times more effective than vaccinated immunity in preventing symptomatic COVID.[5]

21.     Starting November 1, 2021, Syneos also implemented a companywide testing policy for the self-care and oral team contracts, and for those individuals who did not submit to vaccination. Employees were instructed to go to Walgreen first thing in the morning, every day, prior to going out into the field or working, to get Covid-19 testing done.

22.     The following week, Syneos changed its mandated testing policy and allowed employees to purchase at home tests. It later also provided employees with home test kits.

23.     On November 4, 2021, the Los Angeles Times Published an article entitled, "Study Shows Dramatic Decline In Effectiveness of All Three COVID-19 Vaccines Over Time." The article discussed a study of nearly 800,000 U.S. veterans between early March of 2021 and September 2021, which found that Moderna's two-dose COVID-19 vaccine, measured as 89% effective in March, was only 58% effective by September. The effectiveness of the vaccines made by Pfizer and BioNTech, which also requires two doses, fell from 87% effective to 45% in the same period. And lastly, the Johnson & Johnson's single-dose vaccine plunged from 86% effective to just 13% within six months. [6]

---

[5] Dr. Marty Makary, "Dr. Marty Makary: I have medical concerns around Biden's new vaccine mandates," Fox News, (September 10, 2021), https://www.foxnews.com/opinion/medical-concerns-biden-new-vaccine-mandates-dr-marty-makary ; Comparing SARS-CoV-2 neutral immunity to vaccine-induced immunity: reinfections versus breakthrough infections, August 25, 2021, Sivan Gazit, MD MA, Roei Shlezinger, BA, Galit Perez, MN MA, Roni Lotan, PhD, Asaf Peretz, MD, Amir Ben-Tov, MD, Dani Cohen, PhD, Khitam Muhsen, PhD, Gabriel Chodick, PhD MHA and Tal Patalon, MD, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.article-info
[6] Melissa Healy, "Study shows dramatic decline in effectiveness of all three COVID-19 vaccines over time, Los Angeles Times, (November 4, 2021), https://www.latimes.com/science/story/2021-11-04/study-shows-dramatic-decline-in-effectiveness-of-covid-19-vaccines

24.     In the wake of several red flag reports within scientific communities concerning the risks associated with Covid-19 vaccines, various states began adopting new anti-discrimination laws regarding the Covid vaccine.

25.     On December 9, 2021, Syneos sent a letter to employees with approved exemptions stating that those with exemptions were granted only a "**temporary accommodation**" through January 31, 2022, because unvaccinated employees would cause an "undue burden" on the company by remaining unvaccinated. The letter gave employees a choice to either provide proof of vaccination or be terminated. While the letter also offered to allow employees to relocate to another position within the organization which fit their qualifications and need for accommodation, such positions were essentially nonexistent.

26.     Oddly, Syneos exempted all Florida resident employees from this December 9, 2021, announcement.  Employees who resided in Florida were not terminated for lack of vaccination.

27.     All other employees had until January 14, 2022, within which to obtain their first COVID-19 vaccination and upload their vaccination card.  The Plaintiff timely objected to the vaccine for religious grounds, which included and do include: because the four most widely used COVID-19 vaccines across the globe all used abortion-derived fetal cell lines in their research, development, production and/or testing. Those vaccines are: AstraZeneca/Oxford, Janssen/Johnson & Johnson, Moderna, Pfizer/BioNTech. AstraZeneca/Oxford and Janssen/Johnson & Johnson used abortion-derived fetal cell lines in all phases of their vaccine production; in the research, development, production, and testing. Moderna and Pfizer/BioNTech used abortion-derived fetal cell lines in the testing of their COVID-19 vaccines [7].  Plaintiff

---

[7] Admin, "2021 Update: COVID-19 Vaccines Using Aborted Fetal Cell Lines," A Voice For Truth, (November 14, 2021), https://avoicefortruth.com/2021-update-covid-19-vaccines-using-aborted-fetal-cell-lines/

sincerely believes that the ingestion of other strains of human DNA and human tissue – *and those strains of cells which are derived by fetal cell lines* – are profoundly contrary to their religious teachings and beliefs. Three different abortion-derived fetal cell lines were used in the four COVID-19 vaccines: HEK-293, PER.C6, and MRC-5. AstraZeneca/Oxford used two fetal cell lines in the making of its vaccine: HEK-293and MRC-5. Janssen/Johnson & Johnson used PER.C6. Moderna used HEK-293. And Pfizer/BioNTech used HEK-293T/17 (a derivative of HEK-293T, which is a derivative of HEK-293. [8] HEK-293 human fetal cell line (HEK = Human Embryonic Kidney) was derived from a baby aborted in the Netherlands in the early 1970s. The kidney tissue cultures were collected by Dr. Alex VanderEb in 1972, and then used to develop the HEK-293 fetal cell line by Dr. Frank Graham in 1973. The "293" in the HEK-293 refers to the number of fetal samples used in the research. PER.C6 human fetal cell line was developed in 1985/1995 from the retinal tissue of an aborted baby at 18 weeks' gestation. The retinal cultures were taken by Dr. Alex VanderEb in 1985, but it wasn't until 1995 that the PER.C6 cell line using those cultures was developed by Dr. Ron Bout and Dr. Frits Fallaux. MRC-5 human fetal cell line was developed in 1966 by researchers at Medical Research Council in the UK. This cell line came from a 3 ½ month gestation baby boy who was aborted for psychiatric reasons from a physically healthy 27 year old mother. The research and development to make a successful fetal cell line historically takes many abortions, not just the one that is ultimately used for the final product. [9]

---

[8] Admin, "2021 Update: COVID-19 Vaccines Using Aborted Fetal Cell Lines," A Voice For Truth, (November 14, 2021), https://avoicefortruth.com/2021-update-covid-19-vaccines-using-aborted-fetal-cell-lines/

[9] Admin, "2021 Update: COVID-19 Vaccines Using Aborted Fetal Cell Lines," A Voice For Truth, (November 14, 2021), https://avoicefortruth.com/2021-update-covid-19-vaccines-using-aborted-fetal-cell-lines/

28.     Alternatively and cumulatively, plaintiff objected and/or does object on the grounds that the vaccines have been proven conclusively in several studies to cause alteration of human DNA through the integration of SARS-DoV-2 RNA into human DNA by endogenous reverse transcriptase activity, and that RNA sequences can be transcribed into DNA and may be actively integrated into the genome of affected human cells.  (*see, "Potential Mechanisms for Human Genome Integration of Genetic Code from SARS . . . mRNA Vaccination," Authors: Kyriakopoulos, McCullough, Nigh, Seneff, Sept 1, 2022*).  Plaintiff objects to the vaccines in accordance with his sincerely held religious belief, that human DNA – the key to the composition of the whole of the human body – is created by God, and as such claimants sincerely believe that their religions prohibit them from knowingly ingesting substances which may directly alter the key to the composition of the human body.  It is further sincerely believed by all claimants that it is prohibitive by their religions that substances which have a substantial or unreasonable likelihood or risk of causing a change to human DNA may be knowingly ingested by him/her.

29.     Alternatively and cumulatively, plaintiff objected and/or does object on the grounds that, as noted above in this Complaint and as has been widely established by established scientific communities in all Western societies participating in the vaccine trials and administration, the vaccines have been proven to produce myriad adverse, dangerous and even lethal physical effects. The Plaintiff holds sincere religious belief that ingesting (particularly via intravenous injection into the bloodstream) substances known to have a substantial likelihood of such effects is contrary to and prohibited by his/her religion

30.     On November 16, 2021, the Occupational Safety and Health Administration (OSHA) announced that it was suspending all implementation and enforcement efforts related to

the Emergency Temporary Standard (ETS) on mandatory COVID-19 vaccination and testing in the workplace. [10]

31.     Likewise, on November 12, 2021, the Fifth Circuit Court of Appeals recognized in a challenge to the Biden mandate that a naturally immune unvaccinated worker is presumably at less risk than an unvaccinated worker who has never had the virus. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, No. 21-60845, 2021 WL 5279381, at *6 (5th Cir. Nov. 12, 2021).

32.     On January 2, 2022, United States District Judge Mark T. Pittman ordered that the Food and Drug Administration release thousands of pages of documents it relied on to license the COVID-19 vaccine. The order stemmed from a Freedom of Information Act document lawsuit by a coalition of doctors and scientists with the nonprofit Public Health and Medical Professionals for Transparency. [11]

33.     Judge Pittman ordered the FDA to turn over 55,000 pages of documents a month. More than 12,000 pages were released by January 31, 2022;  All of the Pfizer vaccine data became available public for the first time on or about September 30, 2022.

**Documented Medical Risks Associated With The Vaccine and Its Receding Benefits**

34.      In a 38-page document tiled 5.3.6 CUMMULATIVE ANALYSIS OF POST-AUTHORIZATION ADVERSE EVENT REPORTS OF PF-07302048 (BNT162B2) RECEIVED THROUGH 28-FEB-2021[12], *Pfizer admitted that when it applied for FDA approval, it was aware*

---

[10] United States Department of Labor, OSHA, Emergency Temporary Standard, COVID-19 Vaccination and Testing ETS, (November 12, 2021),  https://www.osha.gov/coronavirus/ets2

[11]  See *Public Health and Medical Professionals for Transparency v. Food and Drug Administration,* No. 4:21-CV-01058-P, (N.D. Tex. Jan. 6, 2022).

[12] 5.3.6 CUMMULATIVE ANALYSIS OF POST-AUTHORIZATION ADVERSE EVENT REPORTS OF PF-07302048 (BNT162B2) RECEIVED THROUGH 28-FEB-2021, https://www.riotimesonline.com/wp-content/uploads/2022/03/Pfizer-real-data-released.pdf

*of almost 158,000 adverse events*. This document also features an appendix with a list which reports that Pfizer's COVID vaccine has a range of 1,291 possible side effects.

35.     The list of side effects from the Pfizer vaccine include: acute kidney injury, acute flaccid myelitis, anti-sperm antibody positive, brain stem embolism, brain stem thrombosis, cardiac arrest, cardiac failure, cardiac ventricular thrombosis, cardiogenic shock, central nervous system vasculitis, death neonatal, deep vein thrombosis, encephalitis brain stem, encephalitis hemorrhagic, frontal lobe epilepsy, foaming at mouth, epileptic psychosis, facial paralysis, fetal distress syndrome, gastrointestinal amyloidosis, generalized tonic-clonic seizure, Hashimoto's encephalopathy, hepatic vascular thrombosis, herpes zoster reactivation, immune-mediated hepatitis, interstitial lung disease, jugular vein embolism, juvenile myoclonic epilepsy, livery injury, low birth weight, multisystem inflammatory syndrome in children, myocarditis, neonatal seizure, pancreatitis, pneumonia, stillbirth, tachycardia, temporal lobe epilepsy, testicular autoimmunity, thrombotic cerebral infarction, Type 1 diabetes mellitus, venous thrombosis neonatal, vertebral artery thrombosis among 1,246 other medical conditions following vaccination.

36.     This document demonstrates that people aged 31-50 fare the worst after getting injected with the Pfizer vaccine. And women appear to suffer far more damage from the vaccine compared to men, according to the data, as do both men and women between the ages of 31 and 50. People in the 51-64 years old demographic are next in line, followed by the elderly and younger people between the ages of 18-30.

37.     On September 22, 2022, a secondary analysis of the data from the original clinical trials for the Pfizer and Moderna COVID-19 vaccines was published. This second look of the original 2020-2021 data revealed that Pfizer trial participants who received the vaccine <u>were 36% more at risk of a serious adverse event</u>, while Moderna trial participants who received a vaccine

were 6% more at risk.[13] These severe adverse events were defined as events that resulted in serious conditions such as death, inpatient hospitalization, and persistent disability. In total, vaccinated trial volunteers suffered from 333 serious adverse events per 10,000 participants, including 139 special interest. [14]

38.     Another scientific research paper, published on September 26, 2022, in the Journal of Insulin Resistance, noted that re-analysis of randomized controlled trials using the messenger ribonucleic acid (mRNA) technology suggests a greater risk of serious adverse events from the vaccines than being hospitalized from COVID-19.[15] The article's conclusion was that "it cannot be said that the consent to receive these agents was fully informed, as is required ethically and legally. A pause and reappraisal of global vaccination policies for COVID-19 is long overdue."[16]

39.     Dr. Malhotra explained in the article that results from "the original 2020 trials of the COVID-19 vaccine, suggested that the vaccine was only preventing a person from having a symptomatic positive test, and the absolute risk reduction for this was 0.84% (0.88% reduced to 0.04%). In other words, if 10,000 people had been vaccinated and 10,000 had not, for every 10,000 people vaccinated in trial 4 would have tested positive with symptoms compared to 88 who were unvaccinated. Even in the unvaccinated group, 9,912 of the 10,000 (over 99%) would not have tested positive during the trial period. Another way of expressing this is that you would need to

---

[13] Elsevier, Vaccine, Volume 40, Issue 40, 22 September 2022, pages 5798-5805, <u>Serious adverse events of special interest following mRNA COVID-19 vaccination in randomized trials in adults</u>, Joseph Fraiman, Juan Erviti, Mark Jones, Sander Greenland, Patrick Whelan, Robert M. Kaplan, Peter Doshi; <u>https://www.sciencedirect.com/science/article/pii/S0264410X22010283#b0005</u>

[14] *The Epoch Times*, <u>Vaccinated at Higher Risk of Serious Adverse Events: Reanalysis of Original Trial Data</u>, Zachary Steiber, September 2, 2022, <u>https://www.theepochtimes.com/vaccinated-at-higher-risk-of-serious-adverse-events-reanalysis-of-original-trial-data_4707356.html?utm_source=ref_share&utm_campaign=mb-cc</u>

[15] Malhotra A. <u>Curing the Pandemic of Misinformation on COVID-19 mRNA Vaccines Through Real Evidence-Based Medicine</u>, Part 1, J. Insul. Resist. 2022; 5(1), a71. <u>https://doi.org/10.4102/jir.v5i1.71</u>

[16] *Id.* p.1

vaccinate 119 people to prevent one such symptomatic positive test (assumed to be indicative of an infection, which in itself, is potentially misleading buy beyond the scope of this article)."[17]

40.     Dr. Malhotra further explained that "what the [2020] trial did not show was any statically significant reduction in serious illness of COVID-19 mortality from the vaccine over the 6-month period of the trial, but the actual numbers of deaths (attributed to COVID-19) are still important to note. There were only two deaths from COVID-19 in the placebo group and one death from COVID-19 in the vaccine group. Looking at all-cause mortality over the longer period, there were actually slightly more deaths in the vaccine group (19 deaths) than in the placebo group (17 deaths). Also of note was the extremely low rate of COVID-19 illness classed as severe in the placebo group (nine severe cases out of 21,686 subjects, 0.04%), reflecting a very low risk of severe illness even in regions chosen for the trial because of perceived high prevalence of infection."[18]

41.     In the spring of 2021, prevalence of myocarditis skyrocketed, when the vaccines were rolled out to the younger population. [19]

42.     Dr. Malhotra, noted that "a number or reports have produced concerning rates of myocarditis, depending on age, ranging from 1 in 6,000 in Israel to 1 in 2,700 in a Hong Kong study in male children and adolescents aged 12-17 years."[20]

43.     In a Pfizer animal study published on July 22, 2021, Phizer admits that the mRNA vaccines distribute from the injection site to other organs, and can cause lethal damage. [21]

---

[17] *Id.* p. 3
[18] *Id.* p. 3
[19] *Id.* p. 5
[20] *Id.* p. 5
[21] SARS-CoV-2 mRNA Vaccine (BNT162, PF-07302048) 2.6.4 Summary Statement of the pharmacokinetic study, p. 10, July 22, 2021, Pfizer, Michael Palmer, https://archive.org/details/pfizer-confidential-translated/mode/2up

44.     This 2021 study by Pfizer by Michael Palmer, MD and Sucharit Bhakdi, MD, provides irrefutably proof of causality of vascular and organ damage induced by mRNA vaccines. Drs. Palmer and Bhakdi, discerned that the Pfizer study noted, "that the labelled vaccine shows up in the blood plasma after a very short time – within only a quarter of an hour. The plasma level peaks two hours after the injection. As it drops off, the model vaccine accumulates in several other organs. The fastest and highest rise is observed in the liver and the spleen. Very high uptake is also observed with the ovaries and the adrenal glands. Other organs (including the testes) take up significantly lower levels of the model vaccine. We note, however, that at least the blood vessels will be exposed and affected in every organ and in every tissue."[22]

45.     Dr. Joseph Mercola, recently wrote: "Pfizer, the U.S. Food and Drug Administration and the Centers for Disease Control and Prevention have all repeatedly lied about the safety and effectiveness of the shots, as Pfizer's own trial data show they're about as dangerous as they come." More Studies Confirm the COVID Jab Does More Harm Than Good, Dr. Joseph Mercola, *Epoch Times*, October 4, 2022.[23]

46.     From December 17, 2020, the date of the initiation of the global rollout and administration of the COVID-19 vaccines through August 6, 2021, approximately 50% of the population of the United States had received two doses of the COVID-19 products with 427,831 adverse events (AE) reported to the Vaccine Adverse Events Reports System (VAERS). [24]

---

[22] Vascular and Organ Damage induced by mRNA vaccines: irrefutable proof of causality, Michael Palmer, MD and Sucharit Bhakdi, MD, August 18, 2022, https://doctors4covidethics.org/wp-content/uploads/2022/08/causality-article.pdf
[23] https://www.theepochtimes.com/more-studies-confirm-the-covid-jab-does-more-harm-than-good_4774529.html?utm_source=ref_share&src_src=ref_share&utm_campaign=he-cc&src_cmp=he-cc
[24] Critical Appraisal of VAERS Pharmacovigilance: Is the U.S. Vaccine Adverse Events Reporting System (VAERS) a Functioning Pharmacovigilance System? Jessica Rose, PhD, MSc, BSc, The Institute for Pure and Applied Knowledge, Volume 3:100-129, p. 105, October, 2021, https://61ee839e4c3e409708bac62c--i-do-not-consent.netlify.app/media/Pharmacovigilance%20VAERS%20paper%20FINAL_OCT_1_2021.pdf

47. Of these 427,831 adverse events, the VAERS data demonstrated the following statistics for Severe Adverse Events (SAE), 6,639 deaths, 26,402 hospitalizations, 59,061 ER visits, 7,423 life-threatening events, 6,861 disabled and 258 birth defects reported. Furthermore, female reproductive issues (FRIs) and AE's in children aged 12-18 years are on the rise. By August 6, 2021, there were 6,398 total FRIs and 18,021 AEs reported in young children aged 12 through 18. Those children represented 4.2% of the total VAERS data and 12.9% of all cardiovascular AEs.[25] Further, there is nearly unanimous consensus among statistical experts that VAERS reports of adverse events likely reflect only between 10% and 30% of all actual adverse events.

48. The absolute number of AEs reported to VAERS in the context of the COVID-19 products is approximately 11x higher than for all of the reported AEs for 2020 combined. The absolute number of deaths reported is approximately 42x higher than for all deaths reported for 2020.[26]

49. A study funded by the U.S. Centers for Disease Control and Prevention involved data from ten states collected from August 26, 2021, to January 22, 2022, periods during which both the delta and omicron variants were circulating. Within two months of the second COVID-19 shot, protection against emergency department and urgent care related to COVID-19 was at 69%. This dropped to 37% after five months post-shot.[27]

---

[25] *Id*. p. 106.
[26] *Id*. p. 114.
[27] Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (MMWR) February 18, 2022, Ferdinands JM, Rao S, Dixon BE, et al. Waning 2-Dose and 3-Dose Effectiveness of mRNA Vaccines Against COVID-19- Associated Emergency Department and URgetn Care Encounters and Hospitalizations Among Adults During Periods of Delta and Omicron Variant Predominance -VISON Network, 10 states, August 2021-January 2022. MMWR Morb Mortal Wkly Rep 2022; 7:255-263. DOI:
http://dx.doi.org/10.15585/mmwr.mm7107e2;
https://www.cdc.gov/mmwr/volumes/71/wr/mm7107e2.htm#suggestedcitation

50.     On October 7, 2022, the Surgeon General of Florida, Dr. Loseph A. Ladapo, released an analysis on COVID-19 mRNA vaccines to the public, which stated that their studies showed a significant increased risk of cardiac-related death among men 18-39.[28]

51.     Dr. Ladapo, found that "there is an 84% increase in the relative incidence of cardiac-related death among males 18-39 years old within 28 days following mRNA vaccination."[29]

52.     The findings also showed that "Males over the age of 60 had a 10% increased risk of cardiac-related death within 28 days of mRNA vaccination," and that "Non-mRNA vaccines were not found to have these increased risks among any population."[30]

53.     This analysis comes after the Florida Department of Health issued guidance in March that recommended against use of the COVID mRNA vaccines for "health children and adolescents 5 years old to 17 years old."[31]

54.      On October 10, 2022, during a session of European Parliament, Dutch Parliamentary member Rob Roos, asked Pfizer executive Janine Small: "Was the Pfizer COVID vaccine tested on stopping the transmission of the virus before it entered the market?" Janine Small, president of international developed markets responded: "Did we know about stopping immunization before it entered the market? No…we had to really move at the speed of science to really understand what is taking place in the market." [32]

---

[28] State Surgeon General Dr. Joseph A. Ladapo Issues New mRNA Covid-19 Vaccine Guidance; Florida Department of Health Bulletin, October 7, 2022, https://content.govdelivery.com/accounts/FLDOH/bulletins/3312697
[29] Id.
[30] Id.
[31] Florida Surgeon General: Covid mRNA vaccine found to cause 84% increase in DEATH for men ages 18-39, The Post Millennial, October 2022, https://thepostmillennial.com/florida-surgeon-general-covid-mrna-vaccine-found-to-cause-84-increase-in-death-for-men-ages-18-39
[32] Pfizer Exec Concedes COVID-19 Vaccine Was Not Tested on Preventing Transmission Before Release, The Epochtimes, Jack Phillips, October 11, 2022, updated October 13, 2022, https://www.theepochtimes.com/pfizer-exec-concedes-covid-19-vaccine-was-never-tested-on-preventing-transmission_4788577.html?utm_source=ref_share&src_src=ref_share&utm_campaign=he-cc&src_cmp=he-cc

55.     The Food and Drug Administration wrote on December 11, 2020: "At this time, data are not available to make a determination about how long the vaccine will provide protection, nor is there evidence that the vaccine prevents transmission of SARS-CoV2 from person to person."[33]

56.     Also, in December of 2020, Pfizer CEO Albert Bourla, told NBC News, that Pfizer was "not certain" if recipients of the mRNA vaccine would be able to transmit Covid-19. Specifically, Mr. Bourla stated, "I think this is something that needs to be examined. We are not certain about that right now."[34]     (To date, Phizer, the most criminally penalized company in history, has made in excess $65 billion in revenue from the Covid-related vaccines.)

57.     And in June of 2022, Dr. Deborah Birx, the former White House medical adviser, revealed that there was evidence as early as December of 2020 that individuals who were vaccinated against Covid-19, including those who received the Pfizer vaccine, could still transmit the virus. Dr. Birx has stated, "We knew early on in January of 2021, in late December of 2020, that reinfection was occurring after natural infection."[35]  Indeed, Deborah Birx later went on to contract Covid herself, despite multiple "vaccinations," as did Anthony Faucci and the CEO of Phizer, Albert Bourla, each of whom contracted Covid twice following multiple "vaccinations."

58.     Even Dr. Anthony Fauci, Chief Medical Advisor to the President and Director of the National Institute of Allergy and Infectious Diseases, admitted in July of 2021, that vaccinated people were capable of transmitting the virus.[36]

_____

[33] FDA News Release, FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Authorization for First COVID-19 Vaccine, December 11, 2020, https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19
[34] Pfizer Exec Concedes COVID-19 Vaccine Was Not Tested on Preventing Transmission Before Release, The Epochtimes, Jack Phillips, October 11, 2022, updated October 13, 2022, https://www.theepochtimes.com/pfizer-exec-concedes-covid-19-vaccine-was-never-tested-on-preventing-transmission_4788577.html?utm_source=ref_share&src_src=ref_share&utm_campaign=he-cc&src_cmp=he-cc
[35] Id.
[36] Id.

59.    Prior COVID-19 infection – *i.e.*, natural immunity – offers better protection against symptomatic omicron infection more than one year later than three doses of COVID-19 shots did after one month. A graph in the New England Journal of Medicine shows that previous infection was 54.9% effective against symptomatic omicron infection after more than 12 months, while three doses of Pfizer's COVID-19 shot were only 44.7% effective a month later. The same held true for three doses of Moderna's COVID-19 shot, which were only 41.2% effective after one month, compared to 53.5% effectiveness for natural immunity more than a year later.[37]

60.    Data presented on July 17, 2021, to the Israeli Health Ministry, revealed that, of more than 7,700 COVID-19 cases reported, only 72 occurred in people who had previously had COVID-19 – a rate of less than 1%. In contrast, more than 3,000 more cases – approximately 40% - occurred in people who had received a COVID-19 vaccine. Meaning that those who were vaccinated were nearly 700% more likely to develop COVID-19 than those who had natural immunity from a prior infection.[38]

61.    The final round of correspondence the Defendant issued to the Plaintiff gave him no choice but to get the vaccine or lose his jobs and thereby suffer deprivation of property rights and other damages.

**Facts Surrounding Plaintiff's Employment**

62.    Anthony Sullivan began his employment with Syneos in March of 2014 as a Patient Access Specialist. He was recruited to inVentiv Health to handle inbound calls from patients that

---

[37]  The New England Journal of Medicine; Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections; Heba N. Altarawneh, M.D., Hiam Chemaitelly, Ph.D., Houssein H. Ayoub, Ph.D., Patrick Tang, M.D., Ph.d., et al.; July, 7, 2022, N Engl J Med 2022, 387:21-34, https://www.nejm.org/doi/full/10.1056/NEJMoa2203965
[38] Israel National News, Natural Infection vs Vaccination: Which Gives More Protection?; David Rosenberg, July 13, 2021, https://www.israelnationalnews.com/news/309762b

participated in Pharmaceutical Manufacturers' Patient Assistance Programs. The business segment was called "Patient Access Solutions" His first role was handling calls for AstraZeneca's patient assistance program. Within a few months, as a result of his high performance feedback, he was identified as a top performer and was promoted with pay increase to Patient Navigation Specialist for a Pilot program for Novo Nordisk.

63.     Following a series of promotions, Mr. Sullivan eventually was transferred in November of 2021 to the IC department where he maintained his position as Business Analyst, while performing IC Analyst functions. In this new department, he served as the lead analyst on a new, larger complex project for Amgen and managed/administered its IC design planning alongside a newly-hired manager in training.

64.     Earlier, in September of 2021, Syneos announced that a Vaccination Policy was being implemented.

65.     Mr. Sullivan submitted his initial request for a religious exemption request on or about September 16, 2021, and also met with his Director to discuss his concerns about this policy. Mr. Sullivan was informed there were no roles in the business division, let alone the department, for which the vaccination was not mandatory. He then followed up with a second request for religious exemption on October 7, 2021:

**From:** Sullivan, Anthony <anthony.sullivan@syneoshealth.com>
**Sent:** Thursday, October 7, 2021 11:02 AM
**To:** SM_Leaves-US <Leaves-US@syneoshealth.com>
**Subject:** RE: Exemption Request Determination
**Importance:** High

Hello,

Referencing the Exemption Request Determination response I received on 10/6/21, it appears that the reviewer(s) of my current exemption request are unable to conclude that I have a sincerely-held religious belief that would exempt me from the vaccination requirement. Based on this response, I am reiterating and affirming that my religious beliefs are sincerely-held.

I am claiming exemption from mandatory immunization upon the ground that the proposed immunization interferes with the free exercise of my religious rights.
Included in my religious beliefs are as follows:

I believe in God. I believe that God has provided us with an immune system to protect us from disease. I respect my body as God has made it. Any vaccination or inoculation would be a defilement of what God has given me and violates the religious beliefs I now hold.

This matter is personal and private. Please keep this confidential statement on file as proof of my objection and exemption and kindly advise of any additional information required from me if any.

Thank you,

**Anthony Sullivan**
*Business Analyst, Incentive Compensation*
Deployment Solutions
Syneos Health
500 Atrium Drive
Somerset, NJ 08873
Direct: +1 732 584 5333
Mobile: +1 732 586 7885

syneoshealth.com/sellingsolutions

66.     Mr. Sullivan did not receive a response until October 22, 2021. The response included a company-wide revised exemption form to be completed. Mr. Sullivan completed and submitted this form, which constituted his third attempt to obtain a religious exemption, on or about December 14, 2021.

67.     Following his request for a religious exemption, Mr. Sullivan began to notice, for the first time, expressions of concern by his employer regarding his work performance.

68.     He also began to be summarily excluded from client calls that he had routinely participated in prior to providing his request for exemption.

69.     On or about December 9, 2021, Plaintiff received an email stating that he was being placed "on notice" until December 31 2021, and that he would be terminated unless he submitted to the COVID-19 vaccination.

70.    On December 14, 2021, Plaintiff submitted a second request for religious exemption. This request was denied, but Syneos offered him the option of uploading a vaccination card with proof of vaccination by December 31, 2021.

71.    On December 30, 2021, Plaintiff received an email notifying him of his employment separation email, and he was locked out of his computer.

72.     Mr. Sullivan filed a Charge of Discrimination Charge No. 524-2022-01727. On October 12, 2022, he received a Notice of Right To Sue Letter from the Equal Employment Opportunity Commission.

## COUNT I
## 42 U.S.C. §2000e
## Employment Discrimination Based on Religion

73.    Plaintiff incorporates by reference herein the allegations contained in the preceded numbered paragraphs, and does further allege as follows.

74.    Title VII of the Civil Rights Act of 1964 makes it unlawful for employers subject to the Act to discriminate on the basis of a person's "race, color, religion, sex, or national origin…" 42 U.S.C. §2000e-e2(a). Title VII, 42 U.S.C §2000e, *et. seq.*, is a comprehensive antidiscrimination statute that was enacted to safeguard all individuals from discrimination because of race, creed, color, religion, sex, age or national origin in connection with their employment. "Undue hardship" in the context of religious exemptions is a term associated with Title VII of the Civil Rights Act. "An employer may assert undue hardship to justify a refusal to accommodate an employee's need . . . if the employer can DEMONSTRATE that the accommodation would require "more than a de minimis cost." 29 C.F.R. sect 1605.2 (e)(1). The employer has the burden of persuasion to demonstrate "undue hardship." See e.g. *EEOC v. Firestone*, 515 F 3d 307, 315 (4th Cir. 2008). It should be noted in this case that the only

21

explanation Syneos purported to provide the claimants herein to justify its determination of undue burden was to vaguely and falsely reference "the needs of the business and client demands as they currently exist," and "the requirements of field facing employees current role." There was no suggestion that the requirements of an employee's current role for the client company of Syneos imposed any burdens whatsoever on Syneos. Indeed, Syneos imposed a blanket, non-case-basis, non-supported, unconstitutional assertion of undue hardship. As noted, the facts of the case will unequivocally establish that several of these claimants were even virtually from home.

75. Under Title VII, discrimination based on an individual's right to not inject a substance into their bodies due to an individual's religious beliefs is no less prohibited under Title VII than discrimination based on one's right to pray or worship.

76. Syneos is an "employer" as that term is defined in 42 U.S.C §2000e(b).

77. The actions of Syneos, in forcing the Plaintiff to be terminated from his position were motivated in whole, or in part, out of discriminatory animus based on the Plaintiff's religious beliefs and desire to not inject himself with a foreign and deleterious substance.

78. Syneos arbitrarily extended several times its deadline for employees to submit a request for religious accommodation. The initial deadline was September 16, 2021. Then, this deadline was extended to September 24, 2021. In an email from Michelle Keefe (President of Commercial Solutions), the deadline was set between October 4 and October 8, 2021. Mr. Sullivan was also advised on one occasion that the deadline for submission of a request for religious exemption was October 22, 2021.

79. Defendant's actions were willful, wanton and/or malicious. As a consequence of Syneos' discriminatory practices, the Plaintiff has suffered economic and pecuniary damages for which he is entitled to judgment.

80.     In addition, as a direct consequence of Syneos' actions, the Plaintiff has suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment and mental anguish for which he is entitled to recover compensatory damages in an amount to be determined by the jury.


## COUNT II
### Retaliation

81.     Plaintiff incorporates by reference herein the allegations contained in the preceding numbered paragraphs, and does further allege as follows.

82.     Title VII's anti-retaliation provision in the following terms:

> It shall be unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e-3(a)

83.     The anti-retaliation provision, unlike the substantive provision of Title VII prohibiting workplace discrimination, is not limited to discriminatory actions that affect the terms and conditions of employment. *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2412-13, 548 U.S. 53, 64 (U.S. 2006).

84.     The actions of Syneos in imposing unreasonable work restrictions on the Plaintiff by terminating him and by denying him compensation due to his refusal to submit to a religiously-objectionable vaccine was retaliatory in nature and in violation of § 2000e-3(a).  These actions by the Defendant were unjustified, retaliatory measures to be proven at trial are in direct contravention contrary to sect. 2000e-3(a), plaintiff has been prejudiced thereby and is thereby entitled to damages thereby.

85. Defendant's actions were deliberate, willful, wanton and/or malicious. As a consequence of Defendant's retaliation against the Plaintiff, he has suffered economic and pecuniary damages for which he is entitled judgment.

86. In addition, as a direct consequence of the Defendant's retaliatory conduct, the Plaintiff has suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment and mental anguish for which he is entitled to recover compensatory and/or punitive damages in an amount to be determined by the jury.


## COUNT III:

## HOSTILE WORK ENVIRONMENT

215. All previous paragraphs of this Complaint are hereby incorporated by reference in this cause of action.

216. Beginning on or about September 2, 2022, Syneos began making false insinuations and representations to the Plaintiff as a part of an effort to coerce him into vaccinating that the mandated vaccines were "approved" or "FDA approved." These clear (false) inferences and outright representations continued and were repeated to the Plaintiff up to termination and formed a pattern of attempted coercion of the employee Plaintiff.

217. The right to decline vaccination based upon sincerely held religious belief is a constitutionally protected right.

218. The pattern of continued and intentional misrepresentations by Defendant Syneos constituted an attempt to cause the Plaintiff to forgo his constitutionally protected rights. The repeated statements and inferences that the Syneos mandated vaccine was "FDA approved" was false. The mandated vaccines were not and are not FDA approved. The only FDA approved

vaccine at the time at issue (and at present) was the "Comirnaty" iteration of a separate Covid-related Pfizer vaccine, which Pfizer has chosen not to distribute for usage in order to escape potential liability for injuries, which liability attaches to a drug once it is FDA approved.  In fact, the Syneos mandated vaccines are not "vaccines" at all (although the term is utilized in this Complaint in order to provide simplicity), but were and are instead largely untested experimental drugs which have proven to be dangerous in vaccinated individuals in an unprecedented ratio in proportion to past vaccines and drugs.

219.    The falsehoods regarding FDA approval made to the employee Plaintiff were unwelcome, offensive, abusive and hostile, and were made with motivation to cause Plaintiff to forgo protected employment rights.  Plaintiff endured severe emotional distress during the decision making process due to the coercion produced by the Syneos lies.  Plaintiff suffered loss of employment, income and other damages due to the negligent and/or intentional, wanton, malicious and willful Syneos falsehoods and is entitled to actual, compensatory and punitive damages therefore.

**COUNT IV:**

**FRAUD**

220.    All previous paragraphs of this Complaint are hereby incorporated by reference in this cause of action.

221.    As specifically pleaded above, Syneos, in a succession of Syneos communications to employees, beginning in March, 2021 and ending in September of 2021, contained representations that accommodations would be made for sincere religious exemption.  Given the sudden and unexplained reversal of policy on this point, these representations proved to be not just illusory, but deliberately misleading.  Indeed, to date, no justification for the reversal of policy has

been made, despite numerous employee requests and despite the provision by several employees of proof that Syneos client companies were in no way inconvenienced by the employee's lack of vaccination (See Rachel Royer biographical material, above). In fact, several of the client companies were not even requiring testing, unless the employees wished to have testing, in which case the client company would pay the cost of the testing at no expense to contracting employer, Syneos. The fact is, that the cost for testing would have approached zero. This fact and others were made known to Syneos. Yet, Syneos claimed notwithstanding an "undue hardship," with full intent that the Plaintiff and other employees relied in good faith on this representation.

222. In point of fact and as pleaded specifically herein, a temporary accommodation was made for over two months for other employees, with no known complaints from the paying source client companies regarding the employees' vaccination status. There was in fact no need for significant further expenditure on the part of Syneos for the sought accommodation on the part of the Plaintiff, and this further indicates the disingenuous and deceptive nature of Syneos' about-face.

223. As a further proof of the intentionally deceptive communications of Syneos involving the promises to accommodate that were withdrawn and the reasons of lack of accommodation for the withdrawal of the promises, it must be noted that some employees conducted at least some of their employment activity in a virtual fashion from the home. As noted herein, some had a greater than 50% virtual workload. Syneos deliberately provided no accommodation, no attempt to place these employees in other positions or in increased virtual environments or to fulfill any of the other promises toward accommodation it made in its early communications regarding the vaccination issue. In failing to do so, it lied about its intention to find accommodation. This misleading of the employees, in some cases, was to an extent due to the timing of the firings. If the firing took place

at the end of the quarter, no quarterly bonus would have to be paid by Syneos if the severance was "voluntary," which is how in many cases  Syneos falsely characterized the departure from employment.

224.    Thus, in addition to the deliberately false representations that accommodations would be made, Syneos provided deliberately false and unsupported statements to justify its basis for having made the misrepresentations, which include representations of excessive cost to the company, when in fact Syneos had other, fraudulent and deceptive reasons for dishonoring both promises of reasonableness in accommodation, promises to honor legitimate exemptions (both of which appear to have been at least partially actuated by a desire on the part of Syneos to delay the firings to avoid payment of bonuses and other benefits).  Syneos had a duty of fair and honest dealing with regard to bonuses and benefits legitimately due to employees, which were also fraudulently dishonored.  The Plaintiff relied in good faith on these promises, to his detriment and damage.

225.    Syneos made the representations regarding accommodation, and the subsequent false representations regarding its inability to accommodate with full knowledge of the falsity of said statements and with the full expectation and intention that the plaintiff would rely on said false statements.  Syneos intended to induce reliance and plaintiff did reasonably rely on the false statements to his detriment and damage.  Said damage took the form of being dissuaded from seeking timely legal advice to protect his jobs prior to the vaccinate or terminate letters of September, 2021 and December, 2021, and of failing due to his reasonable reliance on the false representations to seek other employment in order to avoid losing income.  Syneos further later placed notations as recited hereinabove on the post-employment file of the Plaintiff hereto that would tend to discourage future employment by other employers ("Consider" notations, warning

future employers and/or contractors that there may be a problem with the employee). These bad-faith and false "Consider" notations were also false, deceptive and malicious, were made with the intent to deceive, and did deceive, and thereby constitute fraud. Plaintiff is additionally entitled to recover on this basis.

226. The Plaintiff can and will demonstrate pecuniary loss as a direct and proximate cause of the said false and intentionally deceptive representations of Syneos as cited herein. Syneos intended to induce reliance or should reasonably have known such reliance by plaintiff would result, and as such, behaved in a willful, wanton and / or malicious manner. As such, plaintiff is entitled to actual and punitive damages.

## COUNT V:

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER CHAPTER 75 OF THE NORTH CAROLINA CODE

227. All previous paragraphs of this Complaint are hereby incorporated by reference in this cause of action.

228. Cumulatively and/or in the alternative, the false representations and/or concealments of the material facts as specifically plead in Counts I through III above were in or affecting commerce. The misrepresentations, omissions and coercive uses of the employer role in order to deprive certain employees of customary benefits and employment constitute unfair and deceptive acts or practices and/or unfair methodologies of competition on the part of Defendant Syneos.

229. These unfair and deceptive trade practices have redounded to proximately cause damage to the Plaintiff, hereto, and Plaintiff is entitled to judgment therefore. Said judgment

should, in accordance with statute and the facts of this case, be trebled. Plaintiff further requests attorney fees in full payment, as allowed under Chapter 75.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(a)      That Plaintiff be allowed to file this Complaint and that process issue to Syneos requiring it respond within the time required under the Federal Rules of Civil Procedure;

(b)      A declaratory judgment that the Defendant's actions, statements and retaliatory conduct violated the Plaintiff's statutory rights under Title VII, 42 U.S.C. § 2000e;

(c)      That Plaintiff have and recover nominal damages;

(d)      That Plaintiff be awarded compensatory damages, including back pay, front pay and compensatory damages, in an amount to be determined at trial, together with their costs and reasonable attorney's fees against the Defendant Syneos;

(e)      That Plaintiff be awarded punitive damages in an amount to be determined by the jury on all claims so eligible hereunder;

(f)      That Plaintiff be granted compensatory and punitive damages – and attorney fees - - under Plaintiff's claim for Fraud.

(g)      That the Plaintiff recover actual and compensatory damages under Chapter 75 of the North Carolina General Statutes, and that said amount be trebled in accordance with law, and that Plaintiff recover attorney fees hereunder. That said remedy be granted as an alternative and/or cumulative remedy to Plaintiff with relation to other available remedies.

(i)      That the Plaintiff have and recover compensatory and punitive damages as a consequence of damages suffered due to hostile work environment.

(h)      Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Respectfully Submitted,

/s/ Larry L. Crain

**Larry L. Crain** TN Bar No. 9040
**CRAIN LAW GROUP, PLLC**
5214 Maryland Way, Suite 402
Brentwood, TN 37027
Telephone: (615) 376-2600
Fax: (615) 345-6009
Email: larry@crainlaw.legal
*(Request for Admission Pro Hac Vice Pending)*

/s/ Emily Castro

**Emily Castro** TN Bar No. 028203
5214 Maryland Way, Suite 402
Brentwood, TN 37027
Telephone: (615) 376-2600
Fax: (615) 345-6009
Email: emily@crainlaw.legal
*(Request for Admission Pro Hac Vice Pending)*

/s/ Krispen Culbertson

**Krispen Culbertson,** NC Bar No. 17848
Culbertson & Associates
315 Spring Garden Street
Greensboro, NC 27401
Telephone: (336) 272-4299
Email: syneos.law@protonmail.com

*Attorneys for the Plaintiff*